UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

KRSTAFER PINKERTON, et al.,  Plaintiffs,  v. DEBRA REINHARDT et al., Defendants.

MASTER PROSECUTORIAL MATRIX — COURT & CHAMBERS EDITION

**A) EXHIBIT MATRIX (element → fact → Motion pin-cites → FRE → use)**

| Code / Exhibit | What it proves (element) | Fact theory (one sentence) | Motion pin-cites | Primary FRE paths | Custodian / Source | 1006 Demo (if needed) | Where it helps (Winter / Counts) |
|---|---|---|---|---|---|---|---|
| **B1 (Exhibit_B)** — NAC meetings **Apr 14 & 21, 2025** (produced video/transcripts on file) | Material omissions; authority/intent; party admissions | Board states loan ≈ **$3.5M**, collateral = **assessment stream**; "not membership issues"; counsel: "**we represent the board, not the membership.**" | p.15 ¶¶51–52; **p.16 ¶¶53, 57, 58, 59;** mailings: **p.24 ¶108.B;** pair w/ EO: **p.24 ¶104** | 801(d)(2); 803(6); 902(13); 1006 | Assoc. secretary; meeting host logs; presiding officer; counsel | "Collateral Pipeline" (B1→EO) | **Winter:** Likelihood; Equities. **Counts:** §1341/§1343; §1344(2); RICO conduct/materiality |
| **B2 (Exhibit_B-2)** — Reputation file | Public interest; credibility | Press, complaints, agency records, dockets, | Use across Intro/Wint | 803(21); 902(6); 902(4); 1006 | Newsrooms; DBPR; clerks; declarants | "Reputation Heatmap" | **Winter:** Public interest |

| Code / Exhibit | What it proves (element) | Fact theory (one sentence) | Motion pin-cites | Primary FRE paths | Custodian / Source | 1006 Demo (if needed) | Where it helps (Winter / Counts) |
|---|---|---|---|---|---|---|---|
| | | declarations show sustained public concern re **RPM / Debra Reinhardt**. | er (pp.2–5) | | | | |
| **GE** — Controller email / ACH journals | Banking anomalies; lulling | Prior **"fraudulent account activity,"** new acct **...9665, Oct 2024 ACH miss, two payments 11/12/2024.** | p.3; **p.15 ¶¶46–49; p.25 ¶114(a)** | 803(6); 902(11); 902(13); 1006 | RPM Controller/CFO; Popular Bank journals/OFX | "ACH Miss & Backfill Timeline" | **Winter:** Likelihood. **Counts:** §1341/§1343; §1344(2) |
| **BF** — Minutes vs **$22,000** check | §1519 records falsification; credibility | Minutes say **"zero-dollar"** cancellation; **$22,000** "cancellation fee" check issued; edits followed. | **p.17 ¶62;** p.4 ¶6 | 803(6); 1002/1004; 801(d)(2) | Treasurer/Bookkeeper; bank image custodian | "Minutes vs $22,000" | **Winter:** Irreparable harm; credibility. **Counts: §1519** |

| Code / Exhibit | What it proves (element) | Fact theory (one sentence) | Motion pin-cites | Primary FRE paths | Custodian / Source | 1006 Demo (if needed) | Where it helps (Winter / Counts) |
|---|---|---|---|---|---|---|---|
| **EO** — Note / Collateral Assignment / UCC-1 (receiver) | Bank-fraud pretenses; receiver authority | Security corpus pledges **assessments**; **receiver clause** on default. | **p.24 ¶104** (background p.2–3; Rule 9(b) p.26 ¶120(a)–(c)) | 902(4); 803(6); 902(11) | Popular Bank loan officer; state UCC recorder | Include in "Collateral Pipeline" | **Winter:** Likelihood; remedy scope. **Counts:** §1344(2); RICO injury |
| **PA** — PPP-labeled **$28,838** trail | Tracing; scheme mechanics | BS "PPP Proceeds – 10/27 **$28,838**"; GL **"PPP Reimbursement 3/31/2023 $28,838"**; **CDARs 3462** closure. | **p.22 ¶98;** also p.3 | 803(6); 902(11); 902(13); 1006 | NAC accountant; RPM finance; Popular Bank | "PPP $28,838 Flow" | **Winter:** Likelihood. **Counts:** §1341/§1343/§1344(2) |
| **CN** — Gov. Notary / DBPR outcomes | Integrity of instruments (public records) | Confirmed notary violations; resignations/caution; executive downgrades. | **p.17 ¶¶63–67; p.28 ¶133(d)** | 803(8); 902(4) | Governor's Notary Program; DBPR | — | **Winter:** Irreparable harm; integrity |

| Code / Exhibit | What it proves (element) | Fact theory (one sentence) | Motion pin-cites | Primary FRE paths | Custodian / Source | 1006 Demo (if needed) | Where it helps (Winter / Counts) |
|---|---|---|---|---|---|---|---|
| **D-1** — CEOMC 2023 legislative update (video & hosted page identified) | Enterprise / intent | CEOMC presents itself as **"the main lobbying effort"**; **"SB 4-D passed with no amendments and no public testimony."** | **p.18 ¶73**; p.25 ¶114(c) | 803(6); 801(d)(2); 902(13) | CEOMC / RPM custodians; platform host | "Policy/Influence Spine" | **Counts:** RICO enterprise/intent |
| **D-2** — Lobbyist registrations | Regulator entwinement | DBPR Secretary listed as legislative lobbyist (2022–2025). | **p.19 ¶76** | 902(4); 803(8) | Florida Legislature registrar; DBPR | "Policy/Influence Spine" | **Counts:** RICO enterprise context |
| **D-3** — Political-finance ledgers | Funding pipeline | Repeated high-value disbursements (e.g., $45k/$35k/$25k) | **p.19 ¶75**; p.25 ¶114(c) | 803(6); 902(11); 1006 | PAC treasurers; bank custodians | "Policy/Influence Spine" | **Counts:** RICO enterprise pattern |

| Code / Exhibit | What it proves (element) | Fact theory (one sentence) | Motion pin-cites | Primary FRE paths | Custodian / Source | 1006 Demo (if needed) | Where it helps (Winter / Counts) |
|---|---|---|---|---|---|---|---|
| **E** — Retaliation packet | Witness tampering / lulling | Certified C&Ds and LE referrals timed to silence owners/witnesses. | **p.19 ¶80**; Intro p.2 | 803(6); 803(8); 801(d)(2); 1006 | HOA counsel; USPS; SAO/LE | "Retaliation Chronology" | **Winter:** Irreparable harm; public interest |
| **FDIC** — Certified mailing | Federal notice; venue | Complaint/exhibits mailed certified to FDIC Consumer Response Center. | p.3; p.7; p.9 ¶23 | 902(4); 803(8) | FDIC Consumer Response; USPS | — | **Winter:** Public interest; venue |
| **N** — Recorded governance/depositories | Governance baseline | Recorded instruments / Notice of Commencement; off-county depository variances. | p.21 ¶¶93, 97; **p.22 ¶99**; p.14 ¶43 | 902(4); 803(14) | County recorder; association custodian | — | **Winter:** Likelihood; context for GE |

**B) COUNT / ELEMENT SNAPSHOTS (where to look; how to admit)**

- **Mail Fraud (§1341)** — **B1** (meetings), **EO** (receiver clause), **BF** (minutes/$22k), **E** (mailings). Pins: B1 **p.16 ¶¶53,57–59; p.24 ¶108.B; p.24 ¶104**; BF **p.17 ¶62**; E **p.19 ¶80**. Admissibility: 801(d)(2); 803(6)/(8); 902(13); 1006.

- **Wire Fraud (§1343)** — **B1** (streamed admissions), **GE** (email/OFX), **PA** (portal/ledger). Pins: B1 **p.16**; GE **p.15 ¶¶46–49; p.25 ¶114(a)**; PA **p.22 ¶98**. Admissibility: 902(13) + 803(6).

- **Bank Fraud (§1344(2))** — **B1** admissions + **EO** receiver clause. Pins: **p.16 ¶¶53,57–59; p.24 ¶104**. Admissibility: 801(d)(2); 902(4); 803(6).

- **§1519** — **BF** falsification. Pins: **p.17 ¶62**; p.4 ¶6. Admissibility: 803(6); 1002/1004; 801(d)(2).

- **RICO (§1962(c),(d))** — Conduct (**B1**), enterprise/intent (**D-1/2/3**), pattern (**GE/BF/PA/E**), injury (**EO/B1/PA**). Combine 801(d)(2), 803(6)/(8), 902(4)/(11)/(13), 1006.

---

## C) VIDEO REFERENCES (outside the table, for chambers' convenience)

- **CEOMC 2023 Legislative Update (video + hosted page):**
  • YouTube permalink: https://www.youtube.com/watch?v=OkOFcVQeScg
  • RPM hosted page (same program; description/resources): https://resourcepropertymgmt.com/legislative-update-2023/
  *(Prepared as Exhibit with line numbers and speaker tags.)*

- **NAC April Meetings (produced exhibits on file):**
  • **Exhibit_B_Apr14** — produced video + line-numbered transcript (speaker tags).
  • **Exhibit_B_Apr21** — produced video + line-numbered transcript (speaker tags).
  *(If you want public permalinks added here for Apr 14/Apr 21, send them and I will update this section.)*

---

## D) 15-SECOND BENCH SCRIPTS

1. **Collateral & Amount (B1→EO):** "Board: collateral is the assessment stream; line ≈ $3.5M (**B1 p.16 ¶¶57, 53**). Security corpus has a receiver clause (**EO p.24 ¶104**)."

2. **Minutes Falsification (BF):** "Minutes said 'zero-dollar,' yet a **$22,000** cancellation check issued and edits followed (**BF p.17 ¶62; p.4 ¶6**)."

3. **Bank Controls (GE):** "Controller: prior 'fraudulent account activity,' new acct ...9665, Oct 2024 ACH miss, two payments on 11/12/2024 (**GE p.15 ¶¶46–49; p.25 ¶114(a)**)."

4. **Public Interest (B2 + FDIC):** "Reputation evidence shows ongoing harm; certified notice to FDIC (**FDIC p.3; p.7; p.9 ¶23**)."

---

## E) FOUNDATIONS AT A GLANCE

- **B1:** 801(d)(2); minutes/transcript **803(6)**; media/logs **902(13)**.

- **D-1:** 801(d)(2)(C); **803(6)** (ordinary-course archive if applicable); **902(13)** (platform self-auth).

- **EO / N / CN:** **902(4)** public/recorded; **803(8)** where applicable.

- **GE / PA / BF:** **803(6)** + **902(11)**; **1002/1004** for check images; **902(13)** for native exports.

- **B2:** **803(21)** reputation; **902(6)** periodicals; **902(4)** public records.

- **1006** summaries for timelines/flows; underlying produced.

## UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**KRSTAFER PINKERTON, et al., Plaintiffs,**

v.

**DEBRA REINHARDT, et al., Defendants.**

Case No.: _____

### EXHIBIT B1 COVER SHEET
April 14 and April 21, 2025 NAC Meetings (video and transcripts)

**Short Description:**
Board statements on loan amount, collateral as the assessment stream, membership-vote posture, and counsel loyalty; produced media and line-numbered transcripts.

**Motion Pinpoints:**
p.15 paras 51-52; p.16 paras 53, 57, 58, 59; p.24 para 108.B; p.24 para 104.

**Purpose and Relevance:**
See Master Prosecutorial Matrix; this exhibit supports the listed elements and Winter factors.

**Foundation and FRE Path(s):**
801(d)(2); 803(6); 902(13); 1006.

**Primary Custodian(s):**
Association secretary; meeting host logs; presiding officer; counsel.

**Requested Native Production:**
Produce native ESI where applicable (email, platform logs, accounting exports, meeting media) and custodian declarations.

Executed at Washington, DC on 2025-09-11

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**Plaintiffs**
**v.**
**NEW ATLANTIS CLUB CONDOMINIUM ASSOCIATION, ET AL.**

# EXHIBIT B1 COVER SHEET
## APR 14 AND APR 21, 2025 NAC MEETING
### LOAN CORRECTED TO 3,500,000; COLLATERAL IS ASSESSMENTS; NO MEMBERSHIP VOTE; COUNSEL LOYALTY ADMISSIONS

**Exhibit Name:**
Exhibit_B1 (NAC meetings).

**Short Description:**
Two NAC board meetings held on Apr 14, 2025 and Apr 21, 2025 concerning the association loan, including statements that the loan was corrected to approximately 3.5 million, that the collateral is the association's ability to assess owners, that these are not membership issues, and counsel's statement that counsel represents the board and not the membership. Materials include video or audio recordings and/or transcripts, agendas, and attendance records where available.

**Motion Pinpoints:**
Verified Complaint and Motion for Emergency Receivership and Injunctive Relief: p.15 paras 51-52 (meeting record anchor); p.16 paras 53, 57, 58, 59 (loan corrected to 3.5M; collateral is assessments; not membership issues; counsel loyalty).

**Purpose and Relevance:**
Establish admissions by NAC officers and counsel regarding the amount of the loan, the nature of the collateral (the assessment stream), the denial of a membership vote, and the alignment of counsel loyalty. These admissions are material to claims sounding in bank fraud false pretenses, mail and wire fraud omissions, records obstruction, and civil RICO enterprise governance.

**Foundation and Authenticity:**
FRE 901(b)(1) witness with knowledge (secretary or meeting host). FRE 902(13) electronic records self-authentication if hosting vendor certificate or hash values are provided. FRE 803(6) business records for minutes/transcripts kept in the ordinary course. Statements of party-opponents, FRE 801(d)(2).

**Primary Custodians:**
Association secretary or records custodian; meeting hosting provider logs; board president or presiding officer; counsel who spoke on the record.

**Requested Native Production:**
Original meeting recordings (MP4 or platform native), platform logs with timestamps, chat transcripts if any, agendas, notice emails, sign-in records, and final minutes.

**Chain of Custody Note:**
Maintain a hash manifest for each file and preserve platform metadata. If exported from a meeting vendor, include vendor certification identifying the meeting IDs, start and end times, and the names of participants.

**Execution Location:**
Washington, DC

**Date:**
2025-09-10

**UNITED STATES DISTRICT COURT**

DISTRICT OF COLUMBIA

**Exhibit B1**
**New Atlantis Club Board Meetings – April 2025**
*Transcript Evidence, Continuation Record, and RICO Predicate Analysis*

**Prefatory Note**

This Exhibit documents two consecutive board meetings at the New Atlantis Club Condominium Association:

- **April 14, 2025 Meeting** – where owners first confronted the Board regarding a concealed $3.5 million line of credit, falsified minutes, and denial of membership voting rights. https://www.youtube.com/watch?v=JpSKzMvNFMA
- **April 21, 2025 Continuation Meeting** – explicitly noticed as a continuation of the April 14 meeting. This session carried forward the same agenda items and disputes, showing escalating tension, suppression of owner participation, and ratification of unauthorized contracts. https://www.youtube.com/watch?v=wG6BXQfxW7o

These meetings demonstrate **continuity of enterprise conduct**, escalating **owner outrage**, and the use of counsel, management, and board authority to suppress statutory rights and impose unlawful indebtedness.

**Section I – April 14, 2025 Meeting (Transcript Reconstruction)**

**Highlights:**

- Roll call established quorum.
- Treasurer's report corrected minutes to show line of credit was **$3.5M**, not **$3.3M**.
- Owners demanded explanation of SIRS filing delays and legislative misstatements.
- Owners objected to the Board's claim of unilateral power to encumber the Association.
- Motion from owners to object to the loan was ignored; meeting was shut down by the President.

**Key Quotations:**

- *"Instead of 3,300,000, it's 3,500,000."* – Treasurer correction.

- *"It's against the statute, folks."* – Owner objection.

- *"Folks, I'm going to shut this meeting down because we're not—"* – President Serrano threatening closure.

- *"Hello DBPR!"* – Owners shouting into camera, putting regulators on notice.

---

**Section II – April 21, 2025 Continuation Meeting (Official Minutes & Transcript Extracts)**

**Highlights:**

- Chair declared this meeting was a continuation of April 14.

- Motion 1: Ratify Dixie contract for Balcony 408 (engineering only, $3,350). Passed unanimously.

- Motion 2: Ratify Dixie contract for Building 10 ($1.6M). Passed unanimously despite objections.

- Owners demanded bonding, competitive financing, and membership vote. Counsel dismissed these as "board decisions."

- Counsel admitted: *"We represent the board, not the membership."*

- Counsel insisted prior president's unauthorized November 25, 2024 contract signature was valid under "apparent authority."

- President threatened closure again: *"Calm down or I'll close this meeting."*

- Owners protested debt, shouted down suppression, and again invoked DBPR.

**Key Quotations:**

- *"The collateral to pay for this project is... the association's ability to put an assessment on the ownership... we have that $3.5 million line of credit."* – President Serrano.

- *"These are not membership issues."* – Counsel Rabin, dismissing owners' statutory rights.

- *"We represent the board, not the membership."* – Counsel Rabin, confirming conflict of interest.

- *"Calm down or I'll close this meeting."* – President Serrano.

---

## Section III – Analytical Summary (DARVO Pattern & Owner Outrage)

The April 14 and April 21 meetings reveal a **DARVO pattern**: Deny, Attack, Reverse Victim and Offender.

- **Deny:** Board and counsel denied owners' statutory right to vote on material indebtedness.

- **Attack:** Owners were shouted down; meetings closed when dissent arose.

- **Reverse Victim/Offender:** Counsel reframed fiduciary breaches as "duties" of the board, casting dissenting owners as disruptive.

- **Outrage:** Owners shouted *"Hello DBPR!"*; one exclaimed *"You work for me, boy."* The meetings were volatile, showing coercion not consent.

---

## Section IV – Predicate Acts (18 U.S.C. § 1961(1))

| Statute | Quoted Language | Actor | Significance |
|---|---|---|---|
| Mail/Wire Fraud (§§ 1341, 1343) | *"Instead of 3,300,000, it's 3,500,000."* | Treasurer | False minutes misrepresented loan amount. |
| Bank Fraud (§ 1344) | *"The collateral… is the association's ability to put an assessment on the ownership… we have that $3.5 million line of credit."* | President Serrano | Loan collateralized without member approval. |
| Conspiracy Against Rights (§ 241) | *"First of all, why don't we bring this matter… $1.6 million… to a vote over here with everybody." / "These are not membership issues."* | Owners / Counsel Rabin | Denial of membership voting rights. |
| Obstruction (§§ 1503, 1512) | *"Calm down or I'll close this meeting."* | President Serrano | Suppression of participation rights. |

| Statute | Quoted Language | Actor | Significance |
|---|---|---|---|
| Honest Services Fraud (§ 1346) | *"We represent the board, not the membership."* | Counsel Rabin | Admission of conflict, depriving members of honest services. |
| RICO Conspiracy (§ 1962(d)) | *"This contract was signed November 25th, '24... first time it's being brought before the board."* | Board / Counsel | Collusion to ratify unauthorized contracts. |

**Section V – Conclusion**

- **April 14** exposed concealed debt, false records, and members' outrage.

- **April 21** carried forward the same agenda, same loan, and same suppression, proving **continuity** and **open-ended racketeering conduct**.

- The meetings demonstrate:

    o Enterprise coordination between board, counsel, and management;

    o Systematic denial of statutory rights;

    o Fiduciary breaches rising to federal predicates.

**Exhibit B** is therefore presented as **direct evidence of a RICO enterprise in action**, demonstrating both the *pattern* and the *continuity* required under 18 U.S.C. §§ 1961–1968.

April 14, 2025 New Atlantis Board Meeting

Source: https://www.youtube.com/watch?v=JpSKzMvNFMA

*Reconstructed Meeting Transcript (Speaker-Labeled)*

**0:00 – Chair:** "Everyone, we're going to get going in just a second. I do want to make everyone aware the meeting is being recorded visual and audio as we always do this. We have the recording afterwards, but it does have to be said."

**0:14 – Chair:** "All right."

**0:17 – Chair:** "Good evening, folks. Good evening. It is 6:02. We're calling this meeting to order. Peter, are you with us?"

**0:31 – Peter (remote):** "Yes, I'm here."

**0:33 – Unidentified Board Member:** "Yeah, Peter's here."

**0:33 – Chair:** "Okay, so we have a forum of five."

**0:43 – Chair:** "Let me get the agenda."

**0:46 – Unidentified Board Member (aside):** "I feel better now that you're…"
**0:50 – Unidentified Board Member:** "…sitting posted on Friday, April…"
**0:56 – Unidentified Board Member:** "14th."

**0:56 – Another Board Voice:** "Yeah. 14th."

**1:05 – Chair (Roll Call):** "Roll call: B—Director at Large; Roger Penn—Secretary; Cheryl Cleer—Vice President; and Anthony Serrano is present."

**1:21 – Chair:** "We'd like to make a motion to approve the previous meeting minutes."

**1:26 – Board Member (Cheryl Cleer):** "I have a point to bring up. There was a misprint on the minutes for the, um, amount that the line of credit was. Instead of 3,00—3,300,000, it's 3,500,000."

**1:45 – Off-mic Prompt:** "They can't hear that. Can you talk into the microphone so she can hear?"

**1:49 – Off-mic Voice:** "Thank you."

**1:52 – Cheryl:** "I wanted to make an amendment to last, uh, month's meeting. There was a misprint u—about the line of credit that is being, uh, taken out. If the minutes say 3,300,000, then it's 3,500,000."

**2:10 – Chair:** "Thank you, Sher."

**2:12 – Chair:** "Approved pending the correction."

**2:14 – Another Board Voice:** "Approved pending the correction."

**2:17 – Chair:** "Make a motion. Everybody…"

*2:22 – (voices assent)*

**2:25 – Chair (to Treasurer):** "Okay. Thank you. Um, you have transition?"

**2:29 – Treasurer (Cheryl):** "Yes, sir."

**2:31 – Chair:** "Okay. Everyone's in favor of the minutes."

**2:31 – Multiple Voices:** "Yes." / "Yes."

*Treasurer's Report*

**2:34 – Treasurer (Cheryl):** "Okay. Good evening. Um, as treasurer, I just want to give you kind of a brief overview of the amount of money that we have right now and some of the projects that we have been working on."

**2:48 – Treasurer:** "So, as of right now, our, um, assets are—okay, let me break it down a little bit before I give you the total. We have, um— [Music] —$489,299.35 in the SIR reserve and we are continuing to add to that each month."

**3:13 – Treasurer:** "Uh, the general reserve—which [is] what we use, the money that we use to, to function here in the community—is $55,725.15."

**3:28 – Treasurer:** "There are, uh, several other, uh, liabilities or assets that we u—include which u—come to 521,326.52 which gives us a grand total as of right now of 985,545."

**3:58 – Treasurer:** "Um, this figure is as of March 31st. So I'm actually talking about the month of March when I talk about the monies that we have and the projects that we worked on."

**4:14 – Treasurer:** "Um, these projects are, are things that I thought about and I would say we started them in March. They are continuing to go and some of them have been completed so far."

**4:26 – Treasurer:** "Uh, we got—everyone got new, uh, porch lights. Um, and I believe they're all working and they look wonderful because everything is uniform now."

**4:38 – Treasurer:** "Uh, we also got a new treadmill for the, uh, gym and I'm sure that it's already been being used."

**4:46 – Treasurer:** "We started and are continuing—uh, more than 50% completed—on the Building Seven roof."

**4:56 – Treasurer:** "Um, the pools have been repaired and are wonderful to swim in right now."

**4:59 – Treasurer:** "Um, so we did have to replace a couple of the motors."

**5:02 – Treasurer:** "Landscaping has been, um, I believe completed. We've gotten a lot of new plants and—with the help of water, earth—that they should thrive for this, uh, summer and hopefully will still be here when we return in the fall."

**5:23 – Treasurer:** "Uh, the waterfront, uh, has been cleaned up and, um, I think it'll be much safer for the people with kayaks to launch their kayak and to come back in and not have to worry about stumbling and falling over the concrete that was out there."

**5:40 – Treasurer (to audience):** "Have y'all gone down and looked at that?"

**5:41 – Audience Voice:** "I went today. It looks gorgeous."

**5:44 – Another Audience/Board Voice:** "It looks really— Can we have a round of applause for Cheryl?"

**5:47 – Room:** "[Applause]"

**5:50 – Treasurer:** "And the last that I thought of is that we got bids for the Building Six, uh, roof which has now been accepted—um, Acoma I think is the name of the company—and they bid 102,000—"

**6:06 – Board Voice (correcting):** "It's not—they're still under review. They have not been accepted yet."

**6:08 – Treasurer:** "Okay."

**6:10 – Board Voice:** "Well, we—"

**6:10 – Treasurer:** "Okay."

**6:10 – Board Voice:** "—okay, yeah, we have under—"

*6:15 – (voices trail off)*

**6:19 – Treasurer:** "Okay, um, the last thing I want to point out—I think everyone knows—we have 294 units here. And when we talk about people that owe or are in arrears, it really is not a significant amount."

**6:35 – Treasurer:** "Um, very quickly, let me go over—now again, this is as of March 31st, so some of this could have been paid in April and I'm not aware of it yet—but there were only three people that were over 60 days delinquent."

**6:54 – Treasurer:** "Over 90 days are eight condos, which, um, some of them, um, have extenuating circumstances. So—but, uh, and some of them could be paid up by now."

**7:08 – Treasurer:** "Uh, there were 10 people over 30 days and there were—there was a mistake. Um, I don't know if those of you who have kayaks—um, you got a bill for $50 a year and it's actually $25 a year."

**7:26 – Treasurer:** "So, uh, just—it—it shows up on my [career?]—um, report as being delinquent, but just—"

**7:39 – Chair/Manager (Anthony "Tony" Serrano):** "I can speak to that. Okay. So, those incorrect kayak charges—accounting has got it. They're taking them all off the ledgers. They're all being corrected and put back the way they're supposed to. No one's going to get fees for that."

**7:49 – Treasurer:** "I figured that."

**7:50 – Chair/Manager:** "Thank you. One second till she's done speaking."

**7:52 – Audience Voice:** "Sure."

**7:54 – Chair/Manager (to audience):** "Whenever—whenever. Good for you."

**7:57 – Treasurer (wrap-up):** "Okay. So, those are the important things that I think happened in the month of March for—to tell you about."

*Owner/Resident Q&A*

**8:01 – Chair:** "Okay. Let's take the gentleman in the white [shirt] question first."

**8:03 – Audience Member 1 (Gentleman in white):** "Um, I've had a lot of trouble with billing for my, uh, HOA fees. I know Roger's had some trouble. He waved off some other stuff. I think I'm probably carrying a one or two month, uh, advance now because it's take—sometimes I send it in—goes on the 23rd of every month and a lot of times for some reason it doesn't get credited and then a day after it should have been credited it is, but I get a nasty gram and a $50 fee."

**8:34 – Chair/Manager:** "Okay. So—go ahead."

**8:35 – Audience Member 1:** "Yeah. Obviously, I don't understand. It comes out of my bank. I don't touch it. I've been doing it for four years and all of a sudden it's—it's a problem.

Okay. And I'd like that to go away if possible."

**8:45 – Chair/Manager:** "Okay. If you have some time to come speak to me about this, I'll look into it and see what we can do about whatever lag or gap there may be."

**8:51 – Audience Member 1:** "Well, and I'll move it up another week if I need to. You know, I'll pay you on the 15th instead of the 23rd. But, you know, for some reason it takes too long wherever it goes in Miami."

**9:05 – Audience Member 1:** "Okay. To, uh—and like say it's [the] day after and I get a nasty gram. 'You owe me $50 more dollars and we're gonna do all that kind of stuff.'"

**9:10 – Chair/Manager:** "And, you know, I—I'll be happy to look into it for you. Um, you know, the office hours [are] a little reduced right now, but even if you can shoot me an email, we can make an appointment and I'll go over it with you."

**9:21 – Audience Member 1:** "Well, and I haven't gotten a bill for my kayak spaces yet, and we have two."

**9:25 – Chair/Manager:** "It's—it's all logged from the accounting side, so we didn't send paper bills for them."

**9:30 – Audience Member 1:** "I'm happy to go in and pay it whenever. Just tell me how to do it."

**9:33 – Chair/Manager:** "Yeah."

**9:35 – Audience Member 1:** "Should I just bring you a check up for $50 and be good?"

**9:37 – Chair/Manager:** "It's the most direct way."

**9:37 – Audience Member 1:** "Okay."

**9:39 – Chair/Manager:** "Yep. Absolutely."

**9:39 – Audience Member 1:** "So, we'll get that done this week or next week."

**9:40 – Chair/Manager:** "Sure. Sounds good. Um, thank you."

**9:44 – Chair:** "Okay, thank you for bringing that up."

*Reserve Funding / SIRS Questions*

**9:47 – Board Member (to Cheryl):** "Cheryl, you mentioned that you continue to, um, contribute to the [SIR] reserve. Does that—where's that money coming from? Does it come from our HOA?"

**9:58 – Treasurer:** "Yes. So, part of our HOA goes into the SIR reserve."

*10:01 – [Music]*

**10:04 – Off-mic Voices:** "Can't hear it. They need a microphone."

**10:08 – Chair/Manager (summarizing the question):** "She was asking: the money that funds the reserve account—where is it coming from? Is it coming from HOAs? And the answer is yes. Portion of HOAs are allocated."

**10:21 – Audience Member 2:** "Did she say the SIRs?"

**10:23 – Chair/Manager:** "Yes, that's the one—Structural Integrity Reserve Study—as part of the milestone that was done last—what—last summer, June, May. When was that completed?"

**10:35 – Board Member:** "Well, we just—we got the third version of it just recently within the last month."

**10:39 – Audience Member 3:** "What was wrong with the first two versions that we paid for?"

**10:43 – Board Member:** "I wasn't around at that point."

**10:45 – Audience Member 3:** "Well, the rest of them were."

**10:48 – Audience Member 3:** "And has it been submitted to the state?"

**10:53 – Board Member:** "Nobody—"

**10:57 – Board Member (explaining):** "The engineers that do the reserve study, they made some changes in their way of doing business."

**10:59 – Board Member:** "They updated based on a physical inspection or just procedure?"

**11:07 – Board Member:** "Procedure."

**11:09 – Audience Member 3:** "They took out—didn't they take out the—"

**11:12 – Audience Member 3:** "Are you talking about why we got three—three versions of the survey?"

**11:14 – Board Member:** "Yes."

**11:18 – Board Member:** "Yeah. Because we took the one to the state representative and went over it—what needed to be done, what [did] not. And now I guess there's been two more versions since then."

**11:29 – Board Member:** "The first—the first one we received had all nine buildings included in the SIRs report."

**11:34 – Audience Member 3:** "Okay."

**11:38 – Board Member:** "Then, uh, changes with the legislation—"

**11:40 – Audience Member 3 (challenging):** "There's been no changes."

**11:43 – Board Member:** "They weren't counting any under three stories. So that was taken out."

**11:46 – Audience Member 3:** "What changes?"

**11:48 – Board Member:** "We had them take that out."

**11:51 – Board Member (continuing):** "Okay. And then the next version they gave us had, uh, for the projects for, uh, buildings 1, 5, and 10 going forward—the restoration projects— all was line[d] in there and all it said was, uh, 'restoration project.' It didn't break it down as to what do they mean, like, by that, right?"

**12:14 – Board Member:** "So we weren't happy with that. So we wanted it broken out— how—what they meant by that. And I asked them: was that included in the—because there's a lot of supporting documents that come with the full report—and it wasn't."

**12:32 – Board Member:** "So I said that makes no sense. We can interpret that however we want. So that's why we had the third version."

**12:39 – Audience Member 3:** "What changes in legislation? Can you cite those so that I can look those up?"

**12:43 – Chair/Manager:** "Hang on a second. We did have a gentleman come before you with his hand up. Go ahead. What's your answer?"

**12:49 – Audience Member 4:** "All right. Thank you. What changes in legislation have occurred? Because the special session is in session now. So—"

**12:56 – Audience Member 4:** "You have no idea. But you just said that they changed because of— So, I just wanted to look those up."

**12:59 – Board Member:** "We said, 'Why are the other ones in there?' And they said, 'That's the way they wanted it.' And then it changed and didn't have to put two stories in. So, we—"

**13:11 – Board Member:** "So they changed that a bit in early 2024, like the spring or so.

There was a Senate bill that went through where they put in that [sti]mulation for the three stories and over."

**13:18 – Audience Member 4:** "What bill are you talking about? The SB4-D or which one are you talking about?"

**13:25 – Board Member:** "I think it was 143, but I would have to check. I could be off on that number because it was a year ago, okay?"

**13:31 – Audience Member 4:** "Because I have not—I, in fact, I just f—spoke to an attorney a couple weeks ago. There's been no changes in the legislation since SB4-D and if there has I'd like to know so that I can look those up and read them. I have copies of the other ones with me, but I'd like to know because I like to stay up on those."

**13:49 – Audience Member 4:** "Okay. And has it—has our—has it been filed—the SIRs with the state? Have we turned that in? Has that been filed? Because when we checked locally, it hadn't been filed yet. I have an email to that—to that fact. So, have we filed ours with the state? Because many associations have not filed in the state of Florida, and I want to make sure we're compliant."

**14:09 – Board Member/Chair:** "We just received our last revision. So, I think we're still going through that one before we upload to the state."

**14:15 – Chair/Manager (Tony):** "Tony, you have anything further?"

**14:17 – Tony:** "No, I don't. Is—that came within the last—what—two or four weeks."

**14:20 – Tony:** "So that final version hasn't, to my knowledge, hasn't been uploaded, um, into Pinellas County or has been filed with the state of Florida and between the transitions of managers and so forth that—that more—more than likely is not."

**14:34 – Audience Member 4:** "Did we file any of them before December 31st of 2024? Were any of the SIRs filed with the state before December 31st since it was the law to do that? Was that—did that happen or—"

**14:45 – Board Member:** "No, because we were in revisions."

**14:48 – Audience Member 4:** "Okay."

**14:51 – Chair:** "Um, we do have to move on. The SIR is not a topic on the agenda today. So, we've been taking some questions on that. What's your question related—"

**14:58 – Audience Member 5:** "Ten-second question. When does the SIRs—actually—you do—you did the report—when does it have to be done by? When do you have to start doing the—what's the timeline? Does it have to be done in 2025, 2026, 2027? What's the date— when you got the SIRs report, you got it—says you got to do these things—what's the date when you got to do these things?"

**15:19 – Board Member:** "So that kind of keeps changing until—"

**15:21 – Audience Member 5:** "It's in the statute."

**15:23 – Board Member:** "2026. I don't know—I'm not—I'm not asking—I don't know the answer."

**15:25 – Audience Member 5:** "2026."

**15:28 – Board Member:** "It's in the statute."

**15:31 – Board Member:** "And we have to contract by a certain date."

**15:32 – Audience Member 5:** "So are you talking about when we need to be fully funded for—for—"

**15:38 – Board Member:** "No, it's— I'm asking: We did a report."

**15:41 – Board Member:** "Yes."

**15:41 – Audience Member 5:** "Yes, it says we have to fix these things."

**15:43 – Board Member:** "Correct."

**15:45 – Audience Member 5:** "Okay. When do we have to fix these things? According to that report—according to the law?"

**15:48 – Board Member:** "So depending on what was evaluated per railings, buildings, whatever—"

**15:55 – Audience Member 5:** "Yeah."

**15:57 – Audience Member 5:** "It's in—it's in the report. It says you got to fix these things."

**16:00 – Board Member:** "Is what the life expectancy is for that—for that particular line."

**16:03 – Board Member:** "So we're going to pass the life expectancy—whatever. But when do you have to actually do it? So you got the report, let's say yesterday—whenever it was— doesn't matter, right? But when do you actually have to take action on what the report says according to the law?"

**16:20 – Board Member:** "Well, we have to plan ahead. We have to budget it and then it— accordingly."

**16:25 – Audience Member 5:** "I'm not suggesting you should go faster—I'm just trying to know what the law says."

**16:31 – Board Member:** "202— The SIRs does not state constructibility. I believe [it's] funding."

**16:39 – Board Member:** "There's no date."

**16:41 – Board Member:** "There's no date. There's no specific date to when we immediately need to, but we do need to do a process to make sure that we are addressing it in a timely manner."

**16:51 – Audience Member 5:** "Yeah."

**16:54 – Audience Member 5:** "So, so it doesn't have a specific—so, if we need 18 months to do it, huh? So, if we need 18 months to get our ducks in a row, that's okay—as long as you can show in good faith that you are pursuing the repairs, right?"

**17:04 – Board Member:** "Well, you know what? Everybody's going to have to do this stuff all at once, right? All the condos are in the same boat."

**17:07 – Audience Member 5:** "Right."

**17:10 – Board Member:** "So all the engineers, all the contractors—all of them at some point—are going to be busy."

**17:14 – Board Member:** "Oh, they're treating this now, right?"

**17:16 – Board Member:** "So at some point it's going to be—it may be—you could contract with them tomorrow; it may [be] two or three years before they get there. I'm just asking what is the requirement."

**17:26 – Chair/Board:** "Well, we—we as an association have done our due diligence where we're going to have Building [events] started on May 19th."

**17:32 – Audience Voices:** "Why? Why?"

**17:36 – Audience Member 6:** "Why? No. Why? Why?"

**17:39 – Audience Member 6 (to someone):** "You don't have to."

*17:40 – Audience Member 6: "Why?"*

**17:43 – Audience Member 6 (to "Brit"):** "You're not the president."

**17:45 – Audience Member 6:** "Okay."

**17:47 – Audience Member 6:** "You're not the president, Brit."

**17:50 – Audience Voices:** "Yeah, you don't shut us down." / "Yeah, we're tired of being shut down."

**17:55 – Unidentified Board Voice:** "That's fine. Let him come in."

**17:58 – Board/Chair (restating):** "We'll start the project on May 19th."

**18:00 – Audience Member 7:** "Is that the one he signed on November—whatever? What—with no one that deals—with no—with no meetings, with no minutes, with no votes."

**18:11 – Audience Member 7 (to board):** "Remember back in November when he signed it?"

**18:13 – Board Member:** "I—I wasn't part of—"

**18:15 – Audience Member 7:** "Well, then you came in after, but the rest of them remember and it was in the agenda notes for today exactly what date he signed it. So, if you read the agenda notes, you know what date it was? It wasn't, right?"

**18:25 – Audience Member 7:** "So, why are you— There's no way that's legal."

**18:31 – Audience Member 7:** "Yes. There's no way that's legal."

**18:35 – Audience Member 7 (motion):** "I [have] objection to the $3.5 million loan without a vote or any discussion on how—what exactly it's going to cover or breakout summary in that. Does anybody second the motion?"

**18:46 – Audience Voices:** "We objected."

**18:49 – Audience Voices:** "We shouldn't have them. We all—"

**18:52 – Audience Voice:** "There's no—there is no discussion, no vote."

**18:56 – Audience Voice:** "It's—it's not—it's—you can't do that."

**18:56 – Audience Voice:** "It's—it's against the statute, folks."

**19:01 – Board Member:** "So just—Roger and I were just at the attorney's office today."

**19:03 – Audience Member 8:** "Which attorney?"

**19:06 – Board Member:** "Your attorney? Rabin Parker and Gurley."

**19:07 – Audience Member 8:** "Okay. Did you [they] work for Resource Property Management?"

**19:10 – Board Member:** "We don't have attorney—we're not on him."

**19:13 – Board Member:** "So believe it or not, Landis is one of the very few associations—at least that he's represented in his 43 years, and he told me this this morning as we were talking—that doesn't have a vote. Um, I just—I managed another association where it required membership vote to vote."

**19:34 – Audience Member 8:** "Why did it get out of membership?"

**19:36 – Audience Member 9:** "This association's documents don't require the—"

**19:39 – Audience Voices:** "—show us that—show us that again."

**19:43 – Audience Member 6 (to "Brit"/manager):** "You're not the president. You're not the president."

**19:46 – Chair (frustrated):** "Folks, I'm going to shut this meeting down because we're not—"

**19:50 – Audience Voices:** "Of course you are. Of course you are."

**19:52 – Audience Member 6:** "Because when people object, you don't want—"

**19:55 – Audience Voices:** "Of course you are. Of course you are."

**19:58 – Audience Voice:** "Of course you are."

**20:00 – Audience Member 6 (to Brit/manager):** "You're not even the president."

**20:02 – Chair:** "We'll reconvene at a later date."

**20:05 – Chair:** "Um, when we discuss this—"

**20:05–20:12 – Audience Voices (overlapping):** "—nobody's here. Only you're here and you can approve—you—you have—"

**20:12 – Audience Member 6 (to Brit):** "Don't you talk to me."
**20:14 – Audience Member 6:** "Right. You're not the president."
**20:17 – Audience Member 6:** "You're not the president."

**20:19 – Audience Member 6:** "I'm talking to Tony."

**20:21 – Audience Member 6 (to Tony/President):** "We want to know and we want to have a vote, a discussion, and a breakout summary of all of the expenses for that $3.5 million. And we object, of course. Hello, DBPR. Thank you for coming. Hello DPR."

**20:37 – Audience Member 10:** "Don't you have to have a vote of the board meeting?"

**20:47 – Chair:** "Meeting is shut down."

**20:49 – Audience Voices:** "Of course it is. Of course it is."

**20:53 – Audience Member 11:** "We have a voice. We have a voice. This is our complex and we got—"

**20:59 – Audience Voices:** "Yes, we are the owners. You got to listen—"

*21:07 – (overlapping voices)*

**21:09 – Unidentified Resident:** "—call something because the board is good but these people won't listen. I've been here for 25 years. I've never experienced what I've experienced in this last year."

**21:27 – Unidentified Resident:** "I've been—"

**21:32 – Unidentified Resident:** "—37 when—"

**21:38 – Unidentified Resident (to room):** "I— All— Keep your mouth shut and listen."

**21:42 – Unidentified Resident:** "We will."

**21:45 – Unidentified Resident:** "You're not children. You're adults. We're being juries—seniors."

**21:48 – Unidentified Resident:** "Now, wait a minute. Wait a minute. Nobody took a loan."

**21:51 – Unidentified Resident:** "I accomplished my purpose."

**21:54 – Audience Voice:** "Yeah, they didn't take a loan. They applied and were accepted."

*22:05*

---

**Participants & Roles (as inferred)**

- **Anthony "Tony" Serrano** — President / Chairing portions; answers compliance/process; moves to shut down meeting.
- **Cheryl Cleer** — Vice President; delivers **Treasurer's** report (appears to serve as Treasurer function).
- **Roger Penn** — Secretary (mentioned during roll call; referenced during attorney visit).
- **"B"** — Director at Large (first initial only captured).
- **Peter** — Board member participating remotely ("Peter, are you with us? — Yes, I'm here").
- **Audience/Owners** — Multiple speakers, labeled Audience Members 1–11 where not named.
- **"Brit"** — Person repeatedly told "You're not the president, Brit." Context implies a community manager or board member attempting to control discussion.
- **Attorney (referenced)** — "Rabin Parker and Gurley."
- **Management/Accounting** — Referenced in kayak-fee corrections and "transitions of managers."

---

*Motions, Corrections, and Decisions Captured*

- **Minutes Approval:** Motion to approve previous minutes **pending correction**.

  Correction specified: **Line of credit amount** should read **$3,500,000** (not

  $3,300,000). Voice assent recorded ("Everybody… Yes/Yes").

- *Treasurer's Figures (as stated for period ending 3/31):*

  - Structural Integrity Reserve (SIR): **$489,299.35**
  - General (Operating) Reserve: **$55,725.15**
  - "Other liabilities/assets included": **$521,326.52**

  o  *Grand Total: $985,545*

- **Projects Reported:** New porch lights (uniform, installed); new treadmill for gym; Building 7 roof >50% complete; pools repaired (motors replaced); landscaping completed (new plants); waterfront cleaned (safer kayak launch); bids obtained for Building 6 roof (**Acoma** approx. **$102,000**). *Another board voice clarified bids are "still under review," "not accepted yet."*
- **Delinquencies (as of 3/31):** 3 units >60 days; 8 condos >90 days (some extenuating circumstances); 10 units >30 days.
- **Kayak Fee Error:** Incorrectly billed **$50/year**; correct fee **$25/year**. Management states accounting will remove incorrect charges and **no fees** will be assessed for that error.
- **Owner Billing Concern:** Auto-pay timing ("nasty gram" $50 late fee) to be reviewed by management; owner may pay earlier (15th vs 23rd).
- **SIRS Filing Status:** Third revision received within past **2–4 weeks**; **not** uploaded yet to county/state; **not filed before Dec 31, 2024** due to ongoing revisions.
- **SIRS Scope & Legislative Comments:** First version included all nine buildings; later versions excluded under-3-story buildings per board's request and claimed legislative change; audience disputes there were statutory changes since SB 4-D.
- **SIRS Compliance Timeline:** Mixed statements; audience cites **2026** statutory target; board emphasizes budgeting/process and "no specific immediate date," focus on timely good-faith pursuit.
- **Start of Work Announcement:** Board states **project start May 19**; owners question legality/authority and reference a **November** signature without meeting/minutes/vote.
- **Owner Objection/Motion:** Owner verbally **objects to $3.5M loan** "without a vote" or breakout summary; seeks a second; multiple owners voice objection.
- **Authority Dispute & Adjournment:** Repeated challenges that "Brit" is not the president; Chair states **"I'm going to shut this meeting down,"** then **"Meeting is shut down"** and **"We'll reconvene at a later date."**

---

*Issues Raised On the Record (verbatim themes)*

- Recording notice; quorum established.

- Correction to minutes re: **line of credit = $3,500,000**.
- Financial balances and projects executed/underway.
- **Billing/late fee** complaints and kayak fee misbilling.
- **SIRS**: number of versions; scope changes (3-story threshold); whether **any legislative changes** actually occurred; **filing status; timeline** to act on report; **funding vs constructibility** ambiguity.
- **Contracting/Start date** for work **(May 19)** amid questions about approval process.
- **Loan authority**: owner objection to **$3.5M** loan without vote; demand for **breakout summary** and **discussion**.
- **Use of counsel** (Rabin Parker Gurley), claim that association documents **don't require a membership vote** (disputed by owners).
- Meeting **shut down** by Chair after escalating dispute.

---

*Open Questions / Follow-Ups Implied by the Transcript*

1. **Documents & Authority:** Provide the **bylaws/decl/Articles** clause(s) that the board believes **remove or require** a **membership vote** for large loans.
2. **Loan Detail:** Provide a **written breakout summary** of the **$3.5M** loan purpose, covered items, and terms; confirm whether any board vote occurred and when.
3. **SIRS Filing:** Confirm **upload/filing date** and provide **receipt/confirmation** once submitted to state/county.
4. **Legislative Basis:** Identify the **exact bill/statute** cited as changing the 3-story requirement (board referenced "143" in spring 2024; owners dispute any change post–SB 4-D).
5. **Project Start (May 19):** Provide the **contract, signature date, board approval minutes**, and **owner notice** evidence for the project.
6. **Billing System:** Investigate auto-debit timing and late-fee triggers; ensure **grace period** and correct **kayak fee** adjustments are reflected on ledgers.

**This is the end of the April 14, 2025 meeting.**

## NEW ATLANTIS CLUB — SPECIAL BOARD MEETING CONTINUED FROM APRIL 14, 2025

*Prepared from audio transcript provided by client. Speaker attributions reflect the record as stated during the meeting.*

## I. Meeting Details

**Date:** April 21 , 2025 https://www.youtube.com/watch?v=wG6BXQfxW7o

**Scheduled Time:** 6:00 p.m.

**Location / Modality:** In-person with remote participants via Zoom

**Recording:** Meeting recorded (audio/video) as stated by chair

**Meeting Type:** Continuation of board meeting held the prior Wednesday

**Chair/Presiding Officer:** Anthony Serrano (Board President)

**Counsel Present:** Bennett Rabin, Rabin Parker & Gurley (via Zoom)

**Property Management:** Resource Property Management — Brit (Property Manager); Doc Thomas (President, RPM) referenced

**Proof of Notice:** Posted Friday April 18 (as stated by chair)

**Call to Order:** 6:02 p.m. ('602' stated)

**Quorum:** Affirmed: Anthony Serrano (President); Peter Stokler (Director, remote); Roger Penn (Secretary); Cheryl Cleer (Vice President/Treasurer function); Scott Reeves (Director).

II. Roll Call

Chair noted: "We got Peter Stokler online and Anthony Srano here, the board president. We're all here. So, we have a quorum."

Unidentified board voice clarified 'She's treasurer,' referring to Cheryl Cleer.

III. Agenda Limitation

Chair stated that only two items (carried over as Old Business) would be discussed; no off-agenda items allowed. Robert's Rules timing: 3 minutes per speaker at the podium.

# IV. Old Business Item 1 — Balcony 408: Engineering Scope (Dixie/Builder)

Motion by Chair to ratify Dixie contract for Balcony 408 with additional engineering scope; amount stated: $3,350.

Counsel (Rabin) advised: after motion/second, take member comments before board vote.

Member Comments & Board Responses

• Clarification requested on location (Building 4, unit 408) and scope due to concrete/rebar/lenai corrosion discovered after carpet removal; shoring performed; additional engineering required for precast/hollow-core components (per Chair).
• Question: Does $3,350 increase? Answer: No; clarified that $3,350 is engineering only;

construction cost to be priced by Dixie after receipt of engineered scope.

• Treasurer stated funding would come from operating/reserves under building materials/repairs; lenai is an association responsibility.
• Question: Will work be re-bid? Chair: Not practical mid-repair; addressed via change order with existing contractor.
• Comment: $3,300 to estimate cost perceived as high. Chair: Common; "engineers aren't cheap."

Vote

Board vote taken following comments. Result announced by Chair: "Motion passes 5."

## V. Old Business Item 2 — Building 10: Ratification of Dixie Construction Contract

Motion and second recorded (Scott Reeves second). Scope: approximately one-year project; contract amount stated as $1.6 million. Three bids referenced; documents accessible on 'Vanic'.

Member Comments & Questions

• Identity requests for voices "coaching" the meeting; Counsel identified himself (on

Zoom). RPM leadership (Doc Thomas) referenced.

• Escalation/Change Orders: Chair noted changes handled as change orders; Counsel confirmed contract contains cost-escalation thresholds/procedures and is an official record available on request.

• Bonding: Audience questioned lack of bond; Counsel noted bonding is board's preference, ~5–7% cost; could check contract. Board member read: Article 4 indicates 'bonds 2% of total contract value' (interpreted as cost, not confirmation of bond in place). Multiple owners urged requiring a bond.

• Governance/Vote: Motion from floor to postpone ratification until confirming prior president's signing authority (contract signed Nov. 25, '24). Chair acknowledged comment; no postponement vote recorded in transcript.

• Democratic participation concerns: Members urged membership-wide vote for large sums; questioned loan terms, interest, collateral; raised whether some items are 'optional' vs. mandated by Milestone/SIRS.

• Tallahassee legislation: An owner referenced potential change from 3 to 6 stories; urged delay.

• Access and Notice: Owners asked about May 19 tentative start; June 1 notice for early access; what happens if access refused; question whether lawsuits would follow. Chair indicated counsel had previously addressed; later, Counsel stated owners have irrevocable right of access and refusal may result in legal proceedings.

• Collateralization/Financing: Chair stated Popular Bank line of credit ($3.5M) and SER/reserves as primary sources; collateral is association's assessment power; interest rate cited at 6.85%; Popular Bank used as existing processor of monthly assessments; requirement to maintain $60–80k interest reserve noted.

• Milestone/Scope: Board asserted Phase I & II completed; proposed work addresses items identified as needing attention soon (rails, staircases, posts, breezeways) and efficiency with painting to avoid larger future costs.

• Professionalism/Process: Multiple member comments on meeting civility, participation, attorney demeanor, and alternative management exploration.

Counsel Statements (Rabin Parker & Gurley)

• Representation: Counsel represents the association/board, not RPM.

• Authority: Prior president had apparent authority to sign; ratification on this night is

permissible under Florida law.

• Duty: Board's statutory duty to maintain property extends beyond milestone mandates;

business judgment may include cost/efficiency of bundling with painting.

• Bonding: Optional, board decision; ensure compliance with lien-law documentation.

• Loan: Anticipated collateral is assessment power / budget inclusion; specifics depend on final loan documents.

• Access: Irrevocable right of access for this project; refusal may prompt legal action to avoid demobilization/out-of-sequence costs.

• Incidental Damage: Documents require association to address incidental damage caused while performing required maintenance; removing that clause by amendment is possible but not advised given project scope.

Vote

Roll recorded verbally: "I Scott Reeves — I; Roger Penn — I; Cheryl Cle — I; Peter — I; and Anthony Serrano — I."

Result: Motion passes 5–0.

## VI.  Adjournment

Chair moved to adjourn. Meeting concluded.

## VII.  Action Register (from the record)

1. Transmit engineered scope for Balcony 408 to Dixie; obtain pricing proposal for construction work.

2. Ensure official records availability: three bids for Building 10 and the executed contract; provide upon owner request.

3. Clarify bonding status for Building 10: board decision; confirm any bond cost/coverage and circulate summary to owners.

4. Confirm loan documentation specifics with Popular Bank (interest, term, collateralization mechanics, required reserves).

5. Owner notifications: finalize May 19 tentative mobilization plan; provide contact cadence and sequencing for the 30 affected 'lanai' units; document access procedures.
6. Counsel to prepare/access letters outlining irrevocable right of access and remedies for refusal.
7. Publish a concise scope summary distinguishing mandated vs. elective items associated with Milestone/SIRS vs. preventative work aligned with painting.
8. Maintain a running change-order log for Building 10 with cost thresholds and board review triggers, consistent with the contract.
9. Meeting civility/identity protocol: at start of each meeting, state names/roles of all offscreen voices (counsel/management).

## VIII.  Figures, Firms, and Dates (Index)
• $3,350 — Engineering scope (Balcony 408) prior to construction pricing by Dixie.
• ~$1.6 million — Building 10 contract value (Dixie).
• Popular Bank — line of credit up to $3.5 million; interest cited at ~6.85%; reserves holdback ~$60–80k for interest.
• Counsel — Bennett Rabin, Rabin Parker & Gurley.
• Management — Resource Property Management (Brit; Doc Thomas referenced).
• Tentative Start — May 19 (owner access coordination); prior signature date referenced: Nov. 25, '24.

## IX. Certification

*These minutes are prepared from the verbatim transcript as provided by the client. They reflect motions, comments, counsel guidance, and votes as captured. Any subsequent corrections adopted by the Board should be appended as an Addendum.*

*Participants (as referenced in the audio)*

- **Anthony Serrano** — Board President / Chair ("Chair/President")
- **Cheryl Cleer** — Vice President / Treasurer ("Treasurer" when answering money questions)
- **Roger Penn** — Secretary
- **Peter Stokler** — Director (remote)
- **Scott Reeves** — Director (seconds and votes)
- **Brit** — Property Manager (Resource Property Management)
- **Doc Thomas** — President, Resource Property Management (named by another speaker)
- **Counsel: Bennett Rabin** — Association legal counsel, Rabin Parker & Gurley (appears on Zoom)
- **Owners/Residents** — Labeled "Audience Member #" when unnamed

---

*Rebuilt Transcript (speaker + explicit statements)*

**0:05 — Chair/President (Anthony Serrano):** "All right. Thank you for coming to the New Atlantis board meeting scheduled for April 21st at 6:00 p.m. Uh, this is a continuation of the board meeting that we held last Wednesday. So, the agenda items are the same two items that were on the agenda from last week. Uh, these are the items we will be discussing and solely discussing for this meeting. So, I'd like to call the meeting to order"

**0:33 — Chair/President:** "602. Proof of notice was posted on April on Friday 18th 18th um before left. Um I'm making a roll call."

**0:50 — Unidentified Board Voice:** "She's treasurer."

**0:58 — Chair/President:** "All right, we got Peter Stokler online and Anthony Srano here, the board president. We're all here. So, we have a quorum. Uh, the two items are now listed as old business."

**1:09 — Chair/President:** "So, what we'll do is I'll make a motion. Somebody will second. If you'd like to come up and make a comment on that motion, the podium is yours. You have three minutes. We will follow the Robert's rules and you're free to discuss that particular uh motion that is being made. Then I'll make the second motion. Second motion, same process and that's what we'll be doing moving forward. So that way everybody gets their opportunity to talk and you know discuss what's on the agenda. There are no items that will be discussed that are not on the agenda. Just make myself clear."

**1:46 — Chair/President:** "All right. So the first motion is to ratify the Dixie contract for balcony 408 which we realized there was more extensive damage and required more work and we need an additional scope of work from builder home gardens I have a motion I make a motion second okay all in favor I okay anybody wish you do more specific motion please you're motioning to accept the the motion scope of work to ratify to ratify which is going to be at a cost of $3,350."

**2:24 — Chair/President (to counsel):** "And so what Mr. Ben Raven?"

*2:31 — Counsel (Bennett Rabin, Rabin Parker & Gurley): "Yes, sir."*

**2:31 — Counsel (Bennett Rabin):** "You've made a motion and a second. Don't vote on it until the members have an opportunity to give their comments and then you'll vote on it. You will close the membership component of the meeting and then you'll vote on the motion and then move on to the second."

**2:42 — Chair/President:** "Yes, sir."

**2:50 — Audience Member 1:** "It'd be nice if we knew what you were talking about. Over here is building 4 and 408. I think I heard a number. No idea what's going on."

**2:56 — Chair/President:** "So this this proposal is as you know 408 the lai was spalding when they ripped out the carpet. They noticed it was leaking going down into the first floor. Uh once they ripped the carpet up the concrete, the rebar and the lai was sping. They realized there was some structural issues around the lenai itself that holds the structure of

the lenai. As they were working on that, they realized there was more extensive the corrosion and the reinforcement of the slabs and the pre-cast on the lenai. So they had to shore it. As they did more extensive work, they realized there was more extensive damage to the slab than they initially under uh thought as they and then evaluated it further. So this is a proposal from Biller Reinhardt to for additional work to deal with the pre-cast and the hollow core of the of the thick uh pre-cast of the LAI itself which was corroded and folded which now needs to be replaced."

**4:04 — Audience Member 2:** "So is there going to be an increase in this uh proposed $3,300?"

*4:13 — Chair/President: "No."*

**4:20 — Unidentified Board Voice (clarifying):** "Okay. So if that will be included that is for all of the new um that is incorrect. It's strictly this is strictly for the scope of work engineering the engineering portion of it. Then we need once this is submitted to Dixie they will then provide us with a proposal as to the actual work from this scope that needs to be completed to the balcony."

**4:38 — Chair/President:** "So this is just to approve so that we can submit this to uh Dixie construction construction so that they can do the additional work based on scope work. We do want people to come up to the podium."

**4:51 — Unidentified Board/Chair Voice:** "Correct. Up to the podium [Music] please."

**4:59 — Audience Member 3:** "It's $3,400. Is that"

**5:05 — Chair/President:** "$3350? $3,350. I make the proposal that we accept. Thank you."

**5:13 — Audience Member 4:** "I have a question. Is that $3,300 just for the engineering part, but we don't know what it's going to cost us to repair the whole uh when I"

**5:25 — Chair/President:** "That is correct. Um because he can't give us a price until we submit this. So that based on the engineer's recommendations, we don't have a ballpark anything."

**5:31 — Audience Member 4:** "No, ma'am."

**5:37 — Audience Member 5:** "It's just $3,300 to find out how much it's going to cost."

**5:44 — Audience Member 5:** "That's crazy."

**5:51 — Chair/President:** "Do I have anybody else that'd like to come up to discuss the proposal here that I just made a motion for?"

**6:08 — Audience Member 6:** "I have a question. Is that money going to be included in the overall amount of money that we pay every month? Excuse me."

**6:22 — Treasurer (Cheryl Cleer):** "Yes. This comes out of our operating or reserves accounts or building materials and repairs. because the lenai are the association's responsibility."

**6:34 — Audience Member 6:** "Okay. Thank you."

**6:40 — Audience Member 7:** "Yes, sir. Once the scope of the work is finalized, will the will that go out for bid for the work?"

**6:46 — Chair/President:** "In this case, because Dixie's been working on this the whole time, it would be very difficult to have another contractor come in the middle of the repair process to bid on something that's in the middle um middle of the project because then they would have to go back from the very beginning to reassess Dixie's work and then move forward with whatever scope of work would be. So in this case, it would be best from a for a financial scope to keep the same contractor that's already been working on it since it be addressed by a change order to the existing contract which was already bid."

**7:27 — Audience Member 8:** "Tony, do you find it a bit a sec a bit much $3,300 to be able to tell you how much it's going to cost to fix it?"

**7:36 — Chair/President:** "No, sir."

**7:41 — Audience Member 8:** "It's going to cost $3,300 for them to tell you how much it's going to cost."

**7:46 — Chair/President:** "Yes sir. That that's common in this industry."

**7:52 — Unidentified Board/Engineer Reference:** "That's a design."

**7:57 — Chair/President:** "Yes sir. Engineers aren't cheap."

*7:57 —*

**8:05 — Chair/President:** "Okay. So now that we all had all the comments all the question. So I make a motion to ratify. Um all all"

**8:27 — Unidentified Board Voice (procedure):** "favor. So you'll take the vote of the members of the board on the contract and then move on to the next item of business."

**8:33 — Audience Voice:** "Shut up."

**8:33 — Chair/President:** "Yes. The question was asked. We're just waiting. Pete, what did you vote?"

**8:41 — Remote Director (Peter Stokler):** "Okay, got it."

**8:48 — Chair/President:** "Thank you. So, motion passes 5."

**8:55 — Chair/President:** "Motion passes. We get it done."

**9:02 — Chair/President:** "Yes, ratifying Dixiey's contract um for building 10."

**9:09 — Unidentified Board Voice:** "So I make a motion."

**9:09 — Unidentified Board Voice:** "Second. Okay."

**9:15 — Chair/President:** "Yes, we have a second. Steve Scott seconded. Yeah, Scott Re is seconded. Anybody want to? Now we're going to open up and if you would please come to the podium. It'll help us out. Just tell us what I'm talking about. So we're talking about the contract for Dixie Construction that's going to be going on for about a year."

**9:35 — Audience Member 9:** "One question regarding your procedure here tonight. If you could have the people who are in the background coaching you on the meeting, if they can say their name and who they are before they speak because I have no idea who these people are."

**9:46 — Audience Member 9:** "Agreed. As far as up on that screen, I have no idea who these people are that are coaching you. Are the owners here?"

**9:59 — Counsel (Bennett Rabin):** "No, they're apologies, sir. My name is Ben Raymond. I'm legal counsel for the association. I've been at several meetings and introduced myself for a minute at those meetings. So, you obviously were not there. So, apologies for that. I should have done"

**10:09 — Audience Member 9:** "Well, first of all, I was there. I was possibly on Zoom. But, but you need to do this at every meeting so that people that aren't here at other meetings know who you are because a lot of people don't know who you are speaking. You're just like coaching from the background. You know, professionalism stands out here."

**10:26 — Unidentified Voice:** "That's a resource property management determinate."

**10:33 — Audience Member 9:** "Thank you."

**10:33 — Audience Member 9:** "No, it isn't. It's not resource property management. And who is the second one?"

**10:41 — Unidentified Voice:** "Association and Doc Thomas, president Resource Property Management."

**10:49 — Audience Member 10:** "What's the dollar amount of the contract we're talking for the building 10 with the company that's going to do it?"

**10:54 — Chair/President:** "At this point, $1.6 million."

**11:00 — Audience Member 10:** "Was that bid out before?"

**11:00 — Chair/President:** "Yes, it was."

**11:00 — Audience Member 10:** "By who?"

**11:00 — Chair/President:** "There were three bids."

**11:07 — Audience Member 10:** "Do we have a copy of all three?"

**11:07 — Chair/President:** "Yes, we do."

**11:07 — Audience Member 10:** "Have they been presented to everyone?"

**11:13 — Chair/President:** "They're on Vanic. I think we should have a copy to give to people if there are three bids on the project. And if it's going to take years, is there an escalation clause for the cost increases for the price of material?"

**11:23 — Chair/President:** "Those are called change orders. And that's that's possible."

**11:31 — Audience Member 10:** "Don't you think we should have a limit on it?"

**11:31 — Unidentified Board Voice:** "I think there is a limit on this what I remember."

**11:38 — Counsel (Bennett Rabin):** "So the bids, let me let me answer legal counsel for the association. The the the bids are a matter of official records. You can get a copy of those at any time. The contract as well the contract has a provision in there that addresses uh increased costs. If they reach a certain level, then those uh the contract and the association sit down and resolve it. So all those contingency have been uh adequately addressed in the in the written contract which of course is available to you upon request to the property manager."

**12:03 — Audience Member 11:** "What the what's the bond amount on this project right now? And who's the bond holder?"

**12:11 — Chair/President or Counsel:** "I don't believe there's a bond. We not bonded this project."

**12:11 — Audience Member 11:** "Why wouldn't we bond this project when it's over a million dollars? Isn't that unusual?"

**12:18 — Audience Member 12:** "Sir, I'm talking to a lawyer."

**12:24 — Counsel (Bennett Rabin):** "I'm sorry, sir. It's a matter of the board's preference. The bonds tend to cost five to 7% of the contract. Some some contractors can't even get bonding. Uh but I don't believe this is a bonded project. U we'd have to look at the contract to remind myself of that, but I don't believe so."

**12:37 — Audience Member 11:** "Well, I think we should look at the bond and then the bond only gets transferred over to us anyways. The contractor does that cost and gives it back to the people. I think we should have a bond. We didn't have pond in the past, so we got nailed with extra roofers. We got met with a bunch of extra things over the years. I think bond's real important on a project this big."

**12:55 — Chair/President:** "Okay. Thank you, sir. Appreciate your comment."

**13:01 — Board Member (reading):** "So, on page three, line item two under article four contract sum bonds 2% of the total contract value."

**13:09 — Audience Member 11:** "So, it is bonded then."

**13:16 — Unidentified Board Voice:** "No, no, no. It cost 2%. That would be the additional cost."

**13:24 — Chair/President:** "Any other comments? Any other comments?"

**13:29 — Audience Member 13:** "I move that the vote to ratify the district construction contract be postponed till it determined that the former board president had the legal authority to sign the contract without the board approval. This contract was signed November 25th, 24th. Is the first time it's being brought before the board."

**13:47 — Chair/President:** "Thank you for your comments."

**13:47 — Audience Member 13:** "Anybody answer the question?"

**13:54 — Chair/President:** "We appreciate your comment. Thank you."

**14:01 — Audience Member 14:** "What? Who are you representing? Resource property management."

**14:07 — Audience Member 14:** "No, no, no. Thank you. No."

**14:07 — Chair/President:** "Any further on this topic? Any other comments?"

**14:12 — Audience Member 15:** "First of all, why don't we bring this matter that it's like $1.6 6 million to a vote over here with everybody. It's a lot of money that you cannot just as a board decide to do that. Second, we don't know what is the terms of the loan for how long, what is the interest rate, what is the collateral for it. All those did not present to us. So you guys sitting over here, decide whatever you want to hook us up for $1.6 million and above and you expect us to say or this lawyer saying all time, okay, okay, okay. What is okay? No, it's not okay. It doesn't work like that. Now there is more because as we know some of it is mandatory and some of it is voluntary. Also we need to vote for that. Do we want to do that or not? Some people only over here for 30 years, some for five years, maybe people want to stay here for another couple of years, maybe another 20 years. You want to hook us up for something like for another 30 years. All kind of things that you know who knows who going to be here in 30 years or 20 years or whatever it is the figure. Plus there is another thing we as I understand it correct me if I'm wrong. Talahas is reconsidering the whole thing to change it from three stories to six stories. Yes. What is the rush? What is the rush? Wait.

Let's see what they say. It's not 3,500 for the engineering fee. That's different. That's Nobody objected over here. Maybe ask a question or two. That's it. $1.6 million. Not even a vote.

Come on."

**16:17 — Chair/President (question):** "Have you looked at the"

**16:27 — Audience Member 15:** "Have you looked at the building 10 milestone phase one and phase two reports?"

**16:33 — Chair/President:** "Yes, I did."

**16:33 — Audience Member 15:** "Did you understand it?"

**16:38 — Chair/President:** "Yes, I did. Okay. That's why we're That's why it was $1.6 million."

**16:38 — Audience Member 15:** "Yeah, I understand. But not all of it, not all of it is mandatory."

**16:44 — Audience Member 15:** "Not all of them is mandatory. The part that is mandatory, correct me if I'm wrong, is the pillars. And we already did. The rails, all those are optional."

**16:58 — Audience Member 15:** "So give us the option to vote on it to say that we want or not."

**17:05 — Chair/President:** "Okay. What?"

**17:05 — Audience Voices:** "No, no, no. It's not over."

**17:15 — Audience Member 15:** "I can roll around. Somebody else can give me more minutes. I'm still talking. We're still discussing it. You cannot close the meeting like that."

**17:21 — Chair/President:** "Here's the thing. What we're going to do is we're going to continue with this meeting in an organized way."

**17:26 — Audience Member 15:** "It is organized."

**17:26 — Chair/President:** "three minutes to speak. If you're going to abuse that and make it like it was the last meeting, then this board will meet the membership."

**17:40 — Audience Member 15:** "What was abused? I was talking nicely and with points to each one of them, but I didn't get even one answer yet."

**17:46 — Chair/President:** "And if you're going to talk over me, then we will close the meeting."

**17:52 — Audience Member 15:** "You don't have to authority. You are the president."

**17:58 — Audience Member 15 (to counsel):** "The meeting and you close the meeting. It be on you. You're the attorney."

**18:04 — Audience Member 15:** "You're not representing this. You're not representing us. You the president. No. No. No. No."

**18:09 — Chair/President:** "Tony. No. Calm down or I'll close this meeting."

**18:16 — Audience Voice:** "You're a resource property management employee. Close this meeting. Don't."

**18:22 — Audience Member 16:** "Actually, I I got three minutes. I want you to answer his question. my three minutes. You have my three minutes here. My three minutes. I want you to answer his question on my three minutes."

**18:36 — Audience Member 16:** "And when my three minutes run out, he's got three minutes. He wants you to answer his question. It's simple."

**18:44 — Audience Member 17 (to someone):** "I'm not talking to you. I am not talking to you. I'm talking to the board."

**18:50 — Audience Member 18:** "Well, I'm not listening to you. I am talking to the board. Let me pay you. You work for me, boy."

**19:06 — Audience Member 18:** "You're burning up my three minutes by clapping."

**19:13 — Audience Member 16:** "So, Tony, answer the man's question. We have a milestone phase one and phase two, which says there are there's structural damage to the building and it's going to get repaired. He's talking about the other the optional parts."

**19:30 — Chair/President:** "There is no such thing as optional."

**19:30 — Audience Member 16:** "Well, there they're in the there's optional stuff in there. So, why don't you put"

**19:35 — Chair/President:** "Sir, you already had your three."

**19:35 — Audience Member 19:** "Don't shout at me. Don't shout at me. He's taking nicely."

*19:43 — Audience Member 19: "Yeah."*

**19:43 — Audience Member 20:** "Okay. We're not talking to you. We're trying to get answers here."

*19:57 — [Music]*

**20:03 — Audience Member 21:** "I'm not even listening to you. We want to hear what the board has to say. Not you."

**20:18 — Audience Member 22:** "Well, of course, says the ex-president that appointed him."

**20:24 — Audience Member 22:** "Well, by the people, this is America. This is Russia."

**20:32 — Audience Member 22:** "You want to get my three minutes away?"

**20:37 — Audience Member 23:** "I think if everybody has read our documentation, our governing that mic isn't even on."

**20:43 — Audience Voices:** "Let her talk."

**20:50 — Audience Member 23:** "If everybody has read our governing documents for the New Atlantis Club, it gives the board the right to make these decisions. So if we as an organization want to change that where we have a vote, because right now we don't and that's what it says in our governing documents, then we need to follow the procedure, the legal procedure how to change that in our documents. As it stands today, the board had every right to sign that contract. So we need people that are saying that they didn't have the right. They did. It was perfectly legal."

*21:21 — [Music]*

**21:34 — Chair/President:** "Are we ready to call for the question?"

**21:43 — Audience Member 24:** "Okay. I would just like to say this is My second meeting, that other meeting was terrible. Every there are people that are here that want to just know what is going on. And I don't see why it can't be conducted in a civil manner because the people that want the information aren't going to get it because everybody's yelling and screaming. It's got to stop and we don't want to be shut out of the meeting."

**22:12 — Chair/President:** "It's not our intention to either. Thank you."

*22:18 — [Applause]*

**22:23 — Audience Member 25:** "You know, say you say the board has the right to make these decisions. When you're talking $3.5 million, three or four people shouldn't make this decision. It should be a team. A team makes a better decision together. So, I think the way you're conducting this, the way you handle this is very unprofessional. I think this team here and the team, everybody, all these homeowners need to be involved in these decisions. Not three or four people that sit here and make this decision and put this burden on every homeowner."

**22:42 — Audience Member 26:** "And one of them works for resource property management. Two of them. He says he's for the community. He has no idea. He has nothing. No skin in this game. Exactly. Money is all he wants."

**22:58 — Audience Member 26:** "And Tony sits up there and smirks."

**23:04 — Audience Member 27:** "I forgot I'm not. What's that? No, you're When you do this project, how has it been collateralized? Is that working? No."

**23:29 — Audience/Room:** "We need to spend some money on a good system. No, it's convenient that it's not working."

**23:35 — Audience Member 27:** "Some money been collateralized for this project. The money million dollars to three million. How did we collateralize that project?"

**23:43 — Chair/President:** "This project. I can answer that."

**23:53 — Chair/President:** "The collateral to pay for this project is one through the money we collect for on the surf portion of the reserves and the any additional costs that we need we have that $3.5 million line of credit. So any monies that when we run by the money for the service or get to the minimum balance that we must have then we tap into our line of

credit and then uh what we have is an option when it comes to the next budget. If it's ends up being a $2 to $3,000 assessment to pay off whatever money we borrowed, then that's an option or members will be able to uh pay it separate like whatever their part is plus the interest that's incurred or they get their own uh loan and pay it off."

**24:57 — Audience Member 27:** "Scott, they give you a line of credit with no collateral."

**25:08 — Chair/President:** "A collateral is the association's ability to to uh put uh assessment on the ownersh to pay for."

**25:15 — Audience Member 27:** "Has everybody been told what the assessment may be?"

**25:15 — Chair/President:** "We have no idea how much we need to borrow."

**25:21 — Chair/President:** "So we already got a price of a million something now that we're talking about doing that is we have the funds to do that now."

**25:29 — Chair/President:** "that no well we have the we do have the funds available but we have not borrowed this because remember it's not we're not in any loans right now we just have a line of credit"

**25:36 — Audience Member 27:** "you you're telling me that the bank will give you money with no collateral for that"

**25:43 — Chair/President:** "the collateral is the association's ability the owners to assess put an assessment on and pay everybody would have an assessment if you need to sell so on every property in here in order to pay for that line of credit that you're so talking about."

**25:54 — Chair/President:** "Correct."

**26:00 — Audience Member 28:** "Okay. Okay. How many banks we go for for that?"

**26:00 — Chair/President:** "We went through."

**26:07 — Audience Member 28:** "Why just go through one?"

**26:07 — Chair/President:** "Pop. That's the bank we deal with."

**26:12 — Audience Member 28:** "they're charging pretty high interest rate. I think somebody told me 7 and a half%. Is that"

**26:12 — Chair/President:** "6.85?"

**26:12 — Audience Member 28:** "Hasn't the interest rates gone down?"

**26:17 — Chair/President:** "No, actually went up."

**26:17 — Audience Member 28:** "But why would we get another bid? I don't understand why we only get one bid. You do any project anywhere, nobody gets a call. You go buy something at your house, you go to Walmart, and you go to Home Depot, you get two bids on something you buy normally. And you do a project like this, you only have one bid. That's like crazy. It don't make any sense. You wonder why people get upset? Doesn't make any sense."

**26:36 — Audience Voice:** "But didn't we get three bids?"

**26:42 — Chair/President:** "So, we got three bids on the contracts. The reason why we use Popular Bank is because Popular Bank collects all our monthly assessments. So, Popular Bank is aware of what we bring in every month as far as our monthly maintenances. They understand what we have in reserves. They understand our reserve study. They request all those documents that we provide them and understand what where our financial health is. So, that's why we go with them because and also we have to put a specific amount. I believe it was $60 or $80,000 in a reserve account specifically for interest and so forth.

That's the only collateral that they're requesting from us. They also have they know that we have the ability when we use the line of credit to special assess just like we special assessed for paving just like we special assessed for all the um sewer lines that needed to be done in the mid 2000s that fortunately have helped us through these storms that remember all that work that was done in the back. So just like with special sets where we paid 2 or 3,000 for three years straight, that's same same way to make sure that our buildings are structurally sound."

**27:58 — Audience Member 29:** "You know, I brought up bonds with my first inclination when I came up here. I'd like a meeting to have the bond council give them a price. And I believe we should have a bond on a million and a half project. The contractor don't pay it. He's going to do the dollar amount back to us. That's the way it works. The contractor pays it. Sure. He charges us the fee. Why is he not doing it on a million half dollar project? We have the same problem on the roof back there. We didn't have bonds and you put three roofs on building 10. You wonder why you got no money in the reserves. That was a half a million dollars. Went down the tubes with the three roofs. Maybe less, maybe more. I'm not sure the dollar amount. You need bonds. I don't know what everybody looks at and says, 'Yes, yes, yes.' And it never happens. We need a bond on a project for a million half dollars. Get the Can the contractor get a bond? That's number one."

*28:39 — Chair/President: "Yes."*

**28:39 — Audience Member 29:** "Then why don't we do them? I don't understand it. I, you know, you'd say here, 'Okay, you all spoke up. Two weeks from now, the guy starts working and there's no bond. What happens? He falls off the roof. No bond. We don't know what kind of insurance he's got. Is he identifying us any insurance?'"

**28:57 — Chair/President:** "Yes. All his insuranceances. We have everything."

**28:57 — Audience Member 29:** "You got the identification policy from him identifying us of everything he does on this project? I don't think you do. I'd like to see it if you do. Like to see a copy of that, but I think we need a bond, guys."

**29:11 — Audience Voices:** "I agree. Yeah. Yeah." **[Applause] [Music]**

**29:21 — Chair/President:** "Yeah. Insurance. All right. So, any further comments?"

**29:26 — Audience Member 30:** "Can you vote on a bond while you're sitting there?"

**29:33 — Audience Member 31:** "There was a letter sent out December 5th 24th from the board. That's what the comments are."

**29:39 — Chair/President:** "I'm talking I've been talking about the meeting hang on a minute please about the lai has the decision been made what lai you're going to go in or not this letter is it still valid from December 5th 2024 where you're going to only go into the lines with screens or vinyls and then when you tear it out put the new floor in the vinyls or screens are going to be replaced at the next cost Is that still in effect?"

*30:05 — Chair/President: "Yes."*

**30:11 — Chair/President:** "Nothing's changing that."

**30:11 — Audience Member 31:** "Nope. So, it's going to be screens and the vinyls are the ones you're going to move."

**30:18 — Audience Member 31:** "I have a list of 30."

**30:18 — Chair/President:** "Okay."

**30:18 — Chair/President:** "And I've been reaching out to those listed on 30 and I've reached out to some people who are not on the list. So, that but then at ease that they're they've been eliminated."

**30:25 — Audience Member 31:** "Now, the last thing you said the work would start in the middle of May. Is that correct?"

**30:30 — Chair/President:** "Uh the tenative date is if everything starts right May 19th. So, we have to notify you by June 1st if we're going to allow you in early. Is that correct? Is that date still in effect?"

*30:37 — Chair/President: "Yes."*

**30:44 — Audience Member 31:** "Okay. And if we do not allow you to come in, what are the consequences of that? What happens?"

**30:44 — Audience Voice:** "Oh, wait till the attorney jumps on."

**30:52 — Chair/President:** "Well, if you're one of the 30 that is on the list, then we will personally communicate with you and discuss what the attorney already answered that."

**31:03 — Audience Member 31:** "Am I going to be sued if I don't allow you to come into my line?"

**31:08 — Chair/President:** "I just like I said, we will there will be communication for those 30 that are on the list."

**31:14 — Audience Member 31:** "But that doesn't really answer my question. Am I going to be sued if I not let you?"

**31:14 — Chair/President:** "I can't tell you what's going to happen unless there's a conversation."

**31:20 — Audience Voice:** "The attorney last meeting said you would be sued. He will he will chase you down."

**31:32 — Audience Member 32:** "I just have a question about the time, you know, so that I people in my condo when you're going to come to do the work, is there any way I could know ahead to let them know maybe to go visit some relatives or how long it's going to take in my condo and what's going to entail?"

**31:43 — Chair/President:** "Absolutely. Absolutely. Ongo communication."

**31:49 — Audience Member 32:** "When would that be? In advance so that I can get them prepared and maybe I want to put plastic. I might that there doesn't get any windows, the dust, etc. When are we going to be notified so I can let these people know in advance?"

**32:01 — Chair/President:** "So, we're setting up May 19th and then we'll go from there. The eyes are not the first thing that are going to be addressed. So, once we get to that point, we

will notify those 30 unit owners that are on the list. Okay? And that'll be in ahead of time. Okay?"

**32:14 — Audience Member 33:** "So, what if the owner's not there? Because we're an owner. We're one of those 30 that haven't been contacted yet."

**32:20 — Chair/President:** "We will communicate by phone, email, whatever whatever form of communication we have available."

**32:27 — Audience Member 33:** "Oh, okay. Okay."

**32:33 — Audience Member 34:** "And just for the record, the we passed the milestone, but this is optional work that you're saying we're going to do."

**32:38 — Chair/President:** "I don't know what you call passing the milestone, but yes, we had a milestone phase one and two and we passed and we passed it, right? to work with what's how do you what's your terminology using that we can hear you read"

**32:56 — Unidentified Board Member (explaining):** "phase one and phase two have been completed the work that is proposed in this project is all those things that he found that we were told needed to be looked after uh but it wasn't uh Ronald Roger, but his terms weren't this wasn't immediate that need to be done, but we should do it soon. And since we were having the building painted, that was the best time to check out the stuff along the walls, outside of the walls, the uh breezeways. There were more uh posts and those crossarss that were showing determination. So that's to look after that before it gets any worse. And uh the railings, the staircases and the staircases because they're rusting out and this will be rust. This will be a lot uh it is preempting major work that we have to do down the road. So it's preventing."

**34:12 — Audience Member 32:** "So we will be notified, right? And either by phone, email, some kind of communication. So we get to respond in a timely manner to notify others and etc. and prepare the place, right?"

**34:19 — Chair/President:** "Absolutely."

**34:19 — Audience Member 32:** "Okay. And there's no dollar amount, but people want to get their eye done. You don't know the dollar amount about what it would cost and come back to nap, right?"

**34:34 — Audience Member 32:** "Remember you said like in the protector where it says about the thing, the screens to be replaced."

**34:40 — Audience Member 32:** "We would do it and then you would reimburse us."

**34:50 — Chair/President:** "I I believe Ben can answer this question. I believe whatever we whatever the contractor needs to do and if the uh association damages or has to do deconstruction and correct me if I'm wrong, Ben, but I believe it is up to the association as a whole to repair that to where it was."

**35:26 — Chair/President:** "So the ratifying Dixie contract building 10 is on."

**35:32 — Audience Member 35:** "Just a comment. Uh George Clifford 1076. I appreciate the board meeting with West Coast Property Management last week in an effort to possibly look into an alternative from Resource who've been here for 15 years."

**35:51 — Audience Member 35:** "I heard back that it it might be too expensive to look at them. I hope we continue to look at alternatives because this gentleman who's supposed to be our attorney is very rude to everyone in this room and we're paying his salary and he's talking to us like that. That's unacceptable."

**36:09 — Audience Voices:** "I agree. I agree. Yeah."

*36:17 — [Applause]*

**36:23 — Audience Member 36:** "Tony, I got a question. When the guy did this study on the court, he used a three iron. I've never seen that in my life. I've done this for 30 years. I've done major projects in New York State. We've never did a study on construction in integrity of a building with a three iron. That's all they used. I watched him tap the floor three times with a old three iron he must have picked up out of the garbage. That's that's a joke. How do you determine the structural integrity of our building with a three iron? I'm waiting for a response. That's what they used. They don't use that. Tell them they don't use the internet. Nobody uses a joke. Tony, this is a joke. They have a test sign that shows credibility."

**37:05 — Audience Member 36:** "Now it's iron, folks. He's a licensed state. He's not licensed to use a three iron. Pull it up on the internet. It's not a procedure that's recognized in the state of Florida. There's seven of them. That's not one of them. I looked at it today."

**37:23 — Audience Member 36:** "Well, this is something the attorney could answer."

**37:23 — Audience Member 36:** "He don't seem like he's working for us yet. I don't certainly not working for us. Are we paying him?"

**37:30 — Audience Voices:** "Yes. Pay. Are we paying this officer to be here also? Exactly. Are we paying his lunch hour also? Yes."

**37:37 — Chair/President:** "Okay, we'll continue. Are there any other comments?"

**37:43 — Audience Member 37:** "Who are you?"

**37:43 — Property Manager (Brit):** "I'm the property manager."

**37:43 — Audience Member 37:** "Okay. You didn't introduce yourself?"

**37:48 — Property Manager (Brit):** "Yeah. I'm Brit. I'm the property manager. came in after Christie. I've introduced myself a number of times. I'm sorry. She's"

**37:54 — Chair/President:** "So, I have the motion to ratify contract building 10."

**38:08 — Unintelligible (room):** "sirhip."

**38:18 — Audience Member 38:** "I got another question. When the building 10 rook the debacle we had on building 10 rook was anybody part of this team part of that decision making"

**38:29 — Board Member:** "nobody on this team sir on it was my first"

**38:36 — Board Member:** "I didn't even point made"

**38:42 — Chair/President:** "all right we we are going to close from home are closed so motion motion on the"

**38:51 — Audience Voice:** "Bill is trying to address some questions before you take the vote. Who is that?"

**39:05 — Audience Member 39:** "Dave O' Conor 1028. Uh there's a bond supposedly floating around for three and a half million. Uh nobody here wants it. Why is the board pushing this against us? We don't want it. Nobody wants it here. And yet the board is pushing this on us. Kick that. You're supposed to represent us. You're not representing us. Obviously the cold constituent doesn't want it. Yet you keep on pushing this. Uh I don't I No, no, no, no. Uh I don't understand this. Three and a half million. Come on. How much is that going to cost me? What's that going to cost me? If that's going to what is it going to cost me? That's what I'm concerned about. You know, I mean, the HOA keeps going up and up. Now you want a bond for three and a half million to do stuff that we don't know what you're going to do. You know, you talk about these railings and all these optional stuff. You know, you know that ain't going to work. You pull up cement, it's a nightmare. My son's got a million-dollar condo over here on the beach reef. They have the same railings. They put up lattice work on a million dollar condo. It looks great and it didn't cost them anything. But you're pushing a whole bunch of money on us that we don't need. That's my question. Three and a half million. Nobody wants it. But except for you guys. I don't get that at all. That's my story. But I'm sticking back. Check back. Exactly."

**40:46 — Chair/President (to counsel):** "Look at him up there. Wow. Ben, you ready to address?"

**40:54 — Room:** "You're muted, Ben."

**41:01 — Counsel (Bennett Rabin):** "Sorry. Um All right. So, now that the membership portion is is closed, let me address the questions that were directed to me. But for clarity sake, uh despite what uh others have intimated here today, our law firm does not represent resource property management. We represent the association and representing the association, we represent the board and we represent the board to make sure the board complies with the law. And that's where this all started. The board president had the authority to sign that contract. He had the apparent authority to do so. And tonight is the night where they're formally ratifying that action. all perfectly legitimate under Florida law."

**41:35 — Counsel (Bennett Rabin):** "The duty of the board is to maintain the condominium property. It was it goes beyond the milestone issues. The duty is statutory, not just documentary, but it is provided and required by Florida statutes. This board cannot ignore the opinion of the experts that have been to at least three meetings that I've attended to present to you members the fact that the condition of the property is such that these issues need to be addressed for maintenance and viability of the association."

**42:11 — Counsel (Bennett Rabin):** "The fact that they're not mandated, some of the work is not mandated today by the milestone does not have any impact on the board's ability to make its best decisions for the cost benefit of the association. Among the items that the engineer and the contractor presented last time, mostly the engineer, was the fact that the cost of concrete and other services is going up. You're going to have the buildings painted. you would it would just be wasting money not to address these issues at the same time."

**42:43 — Counsel (Bennett Rabin):** "The board has a fiduciary duty to the membership. It will exercise its best business judgment. That's exactly what it has done. That's why this project contains what it contains."

**42:48 — Counsel (Bennett Rabin):** "Bonding is an association or board. The board can require a bond from Dixie or cannot. to rely upon its reputation and make sure that it complies with appropriate construction lean law documentation. Again, that's a board decision. Just like the scope of work in this contract, these are not membership issues."

**43:16 — Counsel (Bennett Rabin):** "They would not respectfully to the to the woman who indicated that the documents could be amended. These documents could not be amended to provide otherwise. You would not put the life safety issues of the association, the construction, the viability of the of the improvements on the membership because the

membership would not vote those issues on themselves. So the board is empowered to do that and that's what the board is doing and that's why."

**43:39 — Counsel (Bennett Rabin):** "How's the loan collateralized? I've not seen the loan documentation, but Popular Bank is one of the loans that they are not collateralizing with any real estate. They're collateralizing with the right That be a special assessment, the right to require a special assessment or to include the debt service in the budgets of the association, the years for which the loan is outstanding. U we'll have to see what those loan documents look like when those loan documents are presented for signature."

**44:16 — Counsel (Bennett Rabin):** "As for accident, as for access to those who do not wish to permit access, you will receive a letter from me that will explain the law. the irrevocable right of access for the purpose of doing this particular job. If access is not provided, then yes, of course, legal proceedings will be initiated against those owners who requ who refuse to provide access. That's why we put a date on there to know because once the contractor mobilizes and is moving in sequence from building to building or from left to right, however they end up doing it, we do not need to pay the uh expense of a of the contractor demobilizing or going out of sequence about how his professors are moving forward because we have an owner who refuses access. So, we will address those uh ahead of time."

**45:08 — Counsel (Bennett Rabin):** "And finally, there is an incidental damage within the governing documents. That's where sort of the conversation went arrive at at the end of last year. Again, this is I've attended at least three meetings where the contractor and the engineer have presented these issues to you. So, you you if you're not informed about what it is, it's because you've not attended those meetings or reviewed any of the documentation provided. Certainly, you're right not to attempt, but don't pretend that this board did not have not been uh transparent in all of all of this particular issue. That's why the engineers and the contractors have been to multiple meetings. But there is an incidental provision provision in the documents. That incidental damage provision that says if the association damages something when it's performing its requirements under the law, it's got to address those damages. And that's when the whole issue of oh my god, what do we have to replace? I don't know if we take the vinyl down the bottom have all those issues came about when the association realized that that provision was in place. And that really has an impact on the dollar amounts that will be necessary such with this project because the board doesn't have a choice as to whether or not to do that. Now the members could amend the governing document and it could eliminate that incidental damage provision and then the be responsible for repairing anything that was that was broken up or removed or damaged while the association was performing its maintenance obligation. probably not

a great provision to take out of the out of the documents under the given the scope of this project, but it is what it is and that's where we're going today."

**46:51 — Counsel (Bennett Rabin):** "So, I've answered all the questions that uh I believe that were presented to the members of the board. Members of the board, do you have any more questions of me that I can answer?"

**47:04 — Board Voice:** "No, not at this time. Thank you."

**47:09 — Board Voice:** "Call the question, sir."

**47:09 — Chair/President:** "Okay. Motion has been made to ratify the Dixie contract for building 10. I Scott Reeves I Roger Penn I I Cheryl Cle I Peter I and Anthony Serrano I."

**47:35 — Chair/President:** "So the motion passes 5 to"

**47:46 — Chair/President:** "making a motion to adjourn."

**47:46 — (End):** "Meetings."